J. L. RICKABAUGH, Appellant, v. M. L. FERRICK et al., Appellees.

MINES AND MINERALS: Miner's Lien—Employee of Lessee—When Entitled to Lien. A miner in the employ of the lessee of a coal mine is entitled to a lien on the mine itself for labor in opening, developing, and operating the mine, on condition and to the extent only that the operations of the lessee have enhanced the value of the mine by improvements incapable of being removed from the mine. It necessarily follows that the miner has no lien on the owner's mine when the operations of the lessee have, owing to the peculiar nature and condition of the mine, worked no effect beyond *extracting coal from the mine*. (Sec. 10324, Code of 1924.)

*Appeal from Marion District Court.*—W. S. COOPER, Judge.

OCTOBER 24, 1924.

ACTION to establish and foreclose a miner's lien as against the property of the employer (who operated the mine under a sublease), his lessor, and the owner of the property. From a decree denying relief against the first lessee and the owner, the plaintiff appeals.—*Affirmed.*

*Clarkson & Huebner,* for appellant.

*Sargent, Gamble & Read, Johnson & Teter,* and *W. H. Lyon,* for appellees.

VERMILION, J.—The plaintiff asked the establishment of a coal miners' lien for labor performed by himself and his assignors in the opening, developing, and operation of a coal mine. Proper claims for liens were filed by plaintiff and those who assigned to him.

There is no serious dispute as to the facts. The defendant Sarah J. Maish is the owner of the real estate involved. The defendant Marion Coal Company had the right, under and by virtue of a lease which is not in evidence, to mine coal from the premises. On December 17, 1920, the Marion Coal Company entered into an agreement with the defendant M. L. Ferrick, whereby there was granted to Ferrick the right to mine coal from the premises, and certain property situated thereon and used in the mining of coal was leased to him. Prior to the execution of the lease to Ferrick, the Marion Coal Company had removed coal from the land by a process known as "stripping." Under this method, the soil lying on top of the coal was removed, and the coal so exposed was taken out from the surface. When Ferrick took possession of the property, he adopted the more usual and customary method of driving underground ways through the coal measures. The coal was mined and removed through these ways or entries to the surface. Whether there had been any previous openings of this sort in the land is not shown; but it appears that he started where the seam of coal had been exposed in the stripping process, and drove what is termed a drift into it, and that this was, at some point, changed into two parallel entries. From these, cross entries were turned,

leading off on either side. This was the usual method of opening and developing a mine. The cross entries were also driven in pairs,—this being necessary to secure a circulation of air,—one being designated as an entry proper, and used for hauling the coal to the surface; and the other, strictly speaking, as an air course, and used primarily for the purpose of ventilation. We will refer to both as entries. Ordinarily, these entries would be about eight feet wide, and the miners employed in them would be paid by the ton for the coal removed in driving them, and, because of the narrow face of coal at which the work was done, an additional price per yard for the distance the entry was extended. In ordinary practice, rooms would be opened or turned off of these cross entries, each with a minable face of coal 20 to 25 feet in width, and from these rooms the coal would be removed in the ordinary process of mining, and the miner would be paid therefor by the ton only.

It is apparent that the removal of coal from rooms is the object of driving the entries, and that the latter is a necessary preliminary to that end, and is in the nature of the opening and developing of a mine. In this instance, it was found that there was no roof or stratum above the coal that would sustain itself, or could be properly supported when the coal was removed, and that it was impracticable to mine the coal in rooms or to remove it from a space of more than about 12 feet in width. Attempts were made to turn rooms, but they were unsuccessful. Practically all the coal produced under Ferrick's lease came from these narrower workings, which, in view of the situation were increased in width to some 12 feet. Cross entries were turned off the main entry more closely together than would have been the case had it been the intention to turn rooms off of the cross entries, and were so turned at such intervals as rooms themselves would ordinarily be started. The only coal that would be opened up or made available under these circumstances, in addition to that removed in driving the entries themselves, would be the pillar of coal left between two parallel entries; and the only practical way of mining this would be that, when the entries had reached the boundary or the limit to which they were to be driven, this pillar would be removed or "pulled," commencing

at the innermost ends of the entries, and the strata above the coal allowed to fall behind the workers, thus destroying the entries.

Ferrick operated the mine in this way until about the middle of August, 1921. The amounts found to be due the plaintiff and his assignors were for work of various kinds in and about the mine for the last half of July and the first half of August. The lower court rendered judgment against Ferrick for the aggregate amount so found due, and established a lien therefor against certain property at the mine owned by him, but denied a lien as against the Marion Coal Company and Sarah J. Maish.

The statute, Section 3105, Code of 1897, provides:

"Every laborer or miner who shall perform labor in opening, developing or operating any coal mine shall have a lien upon all the property of the person, firm or corporation owning or operating such mine, and used in the construction or operation thereof, including real estate and personal property, for the value of such labor, to the full amount thereof, to be secured and enforced as mechanics' liens are."

This section was under consideration in the case of *Mitchell v. Burwell,* 110 Iowa 10. In that case Burwell was the owner of the land on which there was a coal mine. Burwell leased the land and mine to Mallory. Mallory transferred the lease to the Eclipse Coal Company, which operated the mine under Mallory's management. The lease was abandoned by Mallory and the coal company. The plaintiff and his assignors performed labor in and about the mine for which they claimed a lien against Burwell. The lower court found that the leased premises had been enhanced in value by reason of material furnished and labor performed while the mine was operated under the lease, to an amount not less than the amount found to be due, and allowed, and this court upheld, a lien on the land, limited to the amount by which the property had been increased in value by the improvements made by the lessees. We said:

"We have no occasion to decide the rights of miners and others who perform labor for a lessee who added nothing, by improvements or otherwise, to the value of the leased premises, but merely diminished their value by removing coal therefrom.

In such a case it would be a hardship, no doubt, for the owner to be compelled to pay the wages of the laborers, in operating the mine, perhaps to lose his royalty, and then to receive back the leased property at a diminished value. But that is not the case before us. Although the lessor has failed to collect royalties to which she was entitled, to the amount of nearly $1,200, the value of the leased premises, as we have shown, has been enhanced to more than the amount of the plaintiff's claim. The statute expressly provides for a lien for labor performed in developing and operating a coal mine, upon all the property of the owner or operator of the mine used in its construction or operation. The lien was not designed to be limited to property of the operator of the mine which might be removed, or to improvements which he has made. If that were true, the lien would be ineffectual in most cases where the mines are leased, for the reason that the improvements of mines are largely of a value to the mine in which made, and not elsewhere. That is obviously true of air shafts and air courses, and of material used which cannot be removed. Owners of mines who lease them do so charged with knowledge of the statute, which, to some extent, enters into and becomes a part of the contract.''

The section was again considered in *Caster v. McClellan,* 132 Iowa 502. There a mine and its equipment were leased by the owner to Smith, who was to pay all expenses of operating the mine, and, in lieu of royalty, was to deliver to the lessor all coal produced, and receive a stipulated price for it. Smith was indebted to plaintiff and his assignors for labor done in connection with the operation of the mine, and a lien upon the mine was claimed for the amount so due. We held that the word "or," in the portion of the statute giving a lien upon the property of the "person * * * owning or operating such mine," could not be construed as "and," and that the statute did not give a lien upon the property of both the operator and the owner. It was said:

"Now, stated broadly, the statute immediately in question gives to every mine employee a lien for his wages on the mine property of his employer, and it is immaterial whether such employer is owner of the mine or operates the same under a

lease or license. And to the strict wording of the statute we think that there is possible neither the element of uncertainty nor of inconsistency nor of chance for unreasonable result. Accordingly, there is no ground upon which to base an interference with the wording of the statute by the courts; and this especially as, to substitute the word 'and' for the word 'or,' thereby giving a right of lien on the properties of both owner and operator, would be to authorize the forcible taking of one man's property to pay the debt of another. The holding in *Mitchell v. Burwell*, 110 Iowa 10, cited and relied upon by counsel for appellee, is not in conflict with the conclusion above expressed. The precise question now before us was not there discussed or decided. The holding went no further than to declare for a lien in favor of a miner upon a mining property to the extent of the value of the improvements made on the mine by the operating lessee thereof. The case is not an argument for a further extension of the liability of the owner. We conclude that the statute in question did not authorize a lien in favor of plaintiff against the property of the appealing defendants.''

It is the claim of the plaintiff that the work done by Ferrick enhanced the value of the property of both the Marion Coal Company and Sarah J. Maish by an amount in excess of that found due the plaintiff, and that, under the statute as construed by these decisions, he is entitled to a lien against their property, by reason of such enhanced value, to the amount of his judgment against Ferrick.

If it be conceded that the law is as plaintiff claims, his right to a lien against the property of the lessors depends upon a question of fact: whether Ferrick, the lessee, enhanced the value of the property. The lower court found against him upon this, but, we think, stated the question too narrowly. In a written opinion filed by him, it was held that it did not appear that the very labor for which plaintiff and his assignors claimed to recover had enhanced the value of the property, and that, therefore, there could be no lien against the mine. The plaintiff was clearly entitled to a lien against the property of his employer, and the court so held. This is given by the statute, and does

not depend on the character of the work done by him, so long
as it is in the operation of the mine. If he was entitled to a
lien against the property of the lessors, it was because that
property had been enhanced in value, not merely by the labor
for which he claimed a lien, but by the lessee. This is clearly
stated in the cases cited. The question, under plaintiff's claim
as to the law, is whether it has been established that the prop-
erty of either the Marion Coal Company, Ferrick's lessor, or
Sarah J. Maish, the owner, has been enhanced in value by what
was done by Ferrick under his lease, to an amount equal to
plaintiff's claim.

In this connection, some further facts should be stated.
Ferrick had a right, under his lease, to cut timber growing on
the land, for use in the mine. This he did; and the entries
driven by him were timbered by setting posts at the sides, with
cross timbers resting on them and extending across the entry.
The extent to which this was done does not definitely appear,
but, we assume, to such extent as was required to support the
roof. Tracks for hauling the coal out of the mine were laid
where required. The tracking could doubtless be removed; the
timbers probably not. As we have said, the Marion Coal Com-
pany had operated the property as a so-called strip mine. After
Ferrick abandoned it, the coal company resumed this method of
operation, and did not use the entries driven by him. This fact
alone would not defeat the lien. *Clark & Co. v. Parker*, 58
Iowa 509. But it has, we think, a bearing upon the value to
the property of the work done by the lessee.

Ferrick's work did not consist in a continuation or exten-
sion of the underground ways of an existing mine of the same
character. Nor did he open a new way through intervening
strata to the coal. His drift or opening started in the vein of
coal where it had been exposed by the previous stripping. He
was thus producing coal from the very inception of the work.
In extending the underground workings of a mine where the
ways are in the stratum of the material to be mined, develop-
ment and production go hand in hand. It can seldom be said
of a given work that it is wholly one or the other. The removal
of every ton of coal opens the way for the removal of other

coal not otherwise to be reached. While the driving of entries is, in the ordinary work of developing a mine, for the purpose of giving access to larger bodies of coal, they also are productive, and deplete the store of mineral.

As suggested in the *Mitchell* case, and as held in the *Caster* case, the owner's property is not, under the statute, to be subjected to a lien for the payment of labor where the lessee is the employer, and where, instead of improving the property, the lessee is merely diminishing it by the removal of the coal. Indeed, the owner's property, merely as such, is not subject to a lien in favor of the employees of the owner's lessee at all. The statute gives the lien upon the property of the operator, or of the owner, where he is also the operator, but not upon the property of both, where the operator is a lessee. *Caster v. McClellan,* supra. In such case, the lien is upon the property of the lessee; but where his property consists of shafts or entries or other things that cannot be removed, and the value of the owner's property in or upon which these immovable improvements have been made has been enhanced, a lien is given to the extent of the value of the improvements—the extent to which the value of the owner's property has thereby been increased. While the owner's whole property is subject to the lien, it is merely because of the fact, and only to the extent, that the lessee has added to its value by improvements incapable of being severed from it. This is the doctrine of *Mitchell v. Burwell,* supra, and is the most that can be claimed for it.

Persistent efforts were made on the trial by counsel for both parties to elicit from witnesses what could amount to but little more than the expression of an opinion as to whether the work done by Ferrick was for the purpose of improving the mine or of "getting out coal." As pointed out, the effect of such work as was done would ordinarily be to do both. It cannot be doubted that, in driving the main parallel entries, the primary purpose and the more important result were to give access to a larger body of coal; and that, under ordinary circumstances, this would be an improvement to the property, the mine. The driving of the cross entries in this instance could have had no other purpose or result than the getting out of such

coal as their mere making would produce, and the coal in the pillar between them. They opened no way to other coal; they gave haulage way to no other coal; and when the pillar was removed, they could not be maintained, nor was there any reason to maintain them.

After Ferrick failed in his attempt to operate the mine, the employees, plaintiff and his assignors, undertook to operate it under an agreement to the effect that, after payment of actual cost of operation, including royalty due the landowner, any surplus should be applied to the past-due claims of laborers herein involved. They were, however, unable to meet the bare operating expenses.

In view of the physical conditions shown to exist, the impossibility of operating the mine in the customary way, and the impracticability of operating it as the lessee undertook to do, or probably in any other way than by stripping the coal, it may well be doubted if even the driving of the main entries enhanced the value of the property. Needless to say, none of the work done enhanced the value of the property if the only practicable way to remove the coal was by stripping. It tended rather to lessen it by the amount removed, and possibly by the fact that the remaining coal was not continuous; but, be that as it may, it is clear that the other work done in driving cross entries served, under the peculiar circumstances of this case, but to diminish the supply of coal without materially enhancing the value of the lessor's property.

We do not overlook the fact that there is testimony on behalf of the plaintiff that all of the work done enhanced the value of the property by an amount in excess of the judgment against Ferrick. These opinions are not controlling, as against the established facts. If it should be said that the main entries, at least, enhanced the value of the property, the record discloses nothing as to the amount or value of such increase. In short, the record affords no ground for reversing, and no basis for modifying the decree below; and it is—*Affirmed.*

ARTHUR, C. J., and STEVENS and DE GRAFF, JJ., concur.